RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

AVELINO CRUZ MARTINEZ,

*Petitioner-Appellant,*

v.

No. 14-5860

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cv-00174—Aleta Arthur Trauger, District Judge.

Argued: March 3, 2015

Decided and Filed: July 10, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Lynne T. Ingram, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Lynne T. Ingram, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

CLAY, J., delivered the opinion of the court in which GILMAN, J., joined, and SUTTON, J., joined in part. SUTTON, J. (pp. 28–46), delivered a separate opinion concurring in part and dissenting in part.

1

_____

**OPINION**

_____

CLAY, Circuit Judge.   Petitioner Avelino Cruz Martinez ("Petitioner") appeals from the order of the district court denying his petition for a writ of habeas corpus filed under 28 U.S.C. § 2241.   Petitioner is opposing extradition proceedings initiated in June 2013 by the United States on behalf of Mexico based on murder charges arising from a double homicide in a small Oaxacan community that took place on December 31, 2005.   For the reasons that follow, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

**BACKGROUND**

On December 31, 2005, two men were shot in the small community of Santa María Natividad, Ixpantepec Nieves, Silacayoapan in Oaxaca, Mexico.   Santa María Natividad has been described in this case as "a very small village where basically everyone knows each other." (R. 2-17, Flores Alvaro Declaration, PageID 327.)   The town has only about two hundred inhabitants.   One of the shooting victims, Samuel Francisco Solano Cruz, died as he was being transported to another community for medical treatment.   The other victim, Antolín Cruz Reyes, died later in the city of Oaxaca.   Two witnesses identified Petitioner as the shooter.

At the time of the shooting, Petitioner was a legal permanent resident of the United States, and had been continuously living and working in this country, with that status, for more than fifteen years.   Despite his residence in the United States, Petitioner frequently traveled back to Santa María Natividad, where his family, including his wife and children, lived.

The shooting was followed by two very different legal proceedings, one of them leading to the case before us today.   First, on January 12, 2006, the town clerk of Santa María Natividad presided over a meeting between Petitioner's wife and brother, on the one side, and the widow and parents of one of the shooting victims, Solano Cruz, on the other.   At the meeting, both families signed an agreement that had been drafted by the "District Court for San Pedro Silacayoapan, Oaxaca."   (R. 2-17, Silacayoapan Agreement, PageID 335.)   The agreement

identified Petitioner as the person "who committed the homicide" and provided that his family would pay 50,000 pesos to the family of Solano Cruz.  The agreement concluded with the following language:

> The Town Clerk, for his part, as an authority of the community, asks that both parties respect these agreements, which were issued in the district to which we belong.  He also asks that none of the parties in this matter holds a grudge, as we maintain respect towards one another in our community, especially because this unfortunate act took place between families.  He asks that once the parties accept this agreement and commit to enact its terms, that the matter shall be closed.

(*Id.* at 334-35.)  Petitioner's wife understood "that the agreement resolved the case and that Avelino would not be charged with any crime."  (R. 2-17, Flores Alvaro Declaration at 328.) She explained that the family of the other victim, Antolín Cruz Reyes, "has never claimed that Avelino committed any crime against Cruz Reyes."  (*Id.* at 327.)

In an entirely separate series of events, and unbeknownst to Petitioner and his family, a cousin of Solano Cruz who was not a party to the agreement reported the homicide to the attorney general for the State of Oaxaca on January 16, 2006.  The cousin, a witness to the shooting, gave the state authorities a first-hand account of what happened.  He described how he and Solano Cruz drove to the town center to invite the municipal authorities to a goat roast the following day.  The two men found the officials they sought watching a music performance from a grandstand.  Shortly after they took their seats, the pair was approached by Petitioner. According to the cousin's statement, Petitioner shook hands with Solano Cruz, then, while still grasping his hand, drew out a gun, yelled "son of a bitch," and shot Solano Cruz at close range. Cruz Reyes, who was next to Solano Cruz and tried to assist him by putting his arms around him, was also hit.  A deputy municipal official who was also present at the scene gave a corroborating statement, and added that Petitioner fled the scene in his truck, which had Texas plates.  Based on these statements and the investigation that followed, on February 23, 2006, the Oaxacan authorities issued a warrant for Petitioner's arrest on charges of homicide with "unfair advantage" resulting from his use of a firearm.

Meanwhile, Petitioner returned to the United States, where he continued to live openly under his own name.  His landlord verified in a letter submitted to the district court that Petitioner had lived in the same apartment in Lebanon, Tennessee since April 2006.  The

uncontested evidence below established that Petitioner's family in Santa María Natividad was never informed of the warrant for his arrest. Petitioner's wife and children continued to live in Santa María Natividad until 2007, when they left to join Petitioner in the United States, in part because of harassment from the family of Solano Cruz. Even after 2007, Petitioner's brother and father continued to live in the community and remained there as of the commencement of the extradition proceedings in 2013. Yet in all this time, Petitioner's family was never informed of a warrant or of any pending case against Petitioner.

There is no indication in the record of when the Mexican government first learned of Petitioner's whereabouts in the United States. No obstacle to discovering his location has been identified, and it was common knowledge in the tight-knit community of Santa María Natividad that Petitioner lived and worked in the United States. It is more accurate to say that despite the existence of a variety of avenues for learning of Petitioner's location—whether by communication with his family or acquaintances in Santa María Natividad, or by simple inquiry or background check within the United States—the Mexican government made no effort that is reflected in the record of these proceedings to search for him or to obtain his extradition for more than six years.

In an unexplained turn of events, it was the United States government that next followed up on the Mexican arrest warrant. On September 11, 2009, more than three and a half years after the shooting, a U.S. Consular Official contacted the Silacayoapan court to inquire about the status of the warrant. The court responded that the warrant was still "pending and executable." (R. 2-13 Silacayoapan Court Document, PageID 250-51.) The record does not reflect that any further action was taken. The U.S. government has refused to disclose any records related to the 2009 inquiry.

On May 21, 2012, Mexico submitted a diplomatic note invoking the "urgency" clause of the U.S.-Mexico extradition treaty ("1978 Treaty") to request Petitioner's provisional arrest. *See* Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. The note explained that the "[t]he URGENCY to present the request . . . is justified by the fact that AVELINO CRUZ MARTINEZ has been located" at a given address in Lebanon, Tennessee and that "[i]t is feared that he may move elsewhere and his whereabouts will become unknown." (R. 2-6, Initial

Extradition Request, PageID 80.)  In October 2012, months after Mexico submitted its request for Petitioner's provisional arrest, both the United States and Mexico issued posters identifying Petitioner as wanted on murder charges in Mexico.  No attempt was made to arrest Petitioner in 2012.

During this period, Petitioner, who had obtained U.S. citizenship in October 2010, was working to obtain lawful permanent resident status for his wife and children.  In late 2012 or early 2013, Petitioner made a number of short trips to Mexico to meet with U.S. consular officials there to obtain the necessary immigration waivers for his family.  During these multiple trips, neither Mexican nor U.S. authorities took any steps to detain him or to inform him of the pending warrant and extradition request; nor was he prevented from returning to the United States.

On June 11, 2013, acting on behalf of the Mexican government, the U.S. government filed a complaint in the Middle District of Tennessee seeking Petitioner's provisional arrest for the purposes of extradition.  Petitioner was finally arrested on June 21, 2013, and Mexico delivered its formal extradition request on August 20, 2013, more than seven and a half years after the shooting was reported to the Mexican authorities.

Petitioner was certified as extraditable under the terms of the 1978 Treaty by the magistrate judge on January 17, 2014.  He thereafter filed a petition for a writ of habeas corpus in the district court challenging the certification of extraditability.  The district court denied his petition on July 10, 2014.  This timely appeal followed.

Petitioner challenges the denial of his habeas petition on four grounds.  First, invoking Article 7 of the 1978 Treaty, which prohibits extradition where prosecution for the crimes charged would be barred due to the "lapse of time" according to the laws of either country, he argues that he is not subject to extradition because the U.S. statute of limitations has expired as to the homicides he is charged with.  Second, he argues that the same lapse-of-time provision incorporates the Speedy Trial Clause of the Sixth Amendment and that his extradition should be barred on that basis as well.  Third, he argues that the U.S. government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), as applied to extradition proceedings by this Court in *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993), when it declined to disclose the

2009 consular communications regarding the Mexican warrant for Petitioner's arrest. Fourth and finally, he argues that his procedural due process rights were violated when he was not granted a prompt hearing and judicial review of the purported "urgency" asserted to allow his provisional arrest under Article 11 of the 1978 Treaty. We consider each of these arguments in turn.

## DISCUSSION

### *Scope and Standard of Review*

Because an order certifying extraditability under 18 U.S.C. § 3184 is not a final order capable of appellate review, judicial review of extradition proceedings may be sought only by petition for a writ of habeas corpus. *Collins v. Miller*, 252 U.S. 364, 369 (1920); *see also In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (discussing this framework in some depth). As this Court has previously explained, 28 U.S.C. § 2241 provides "the appropriate habeas remedy" in such cases. *In re Extradition of Drayer*, 190 F.3d 410, 412 n.2 (6th Cir. 1999) ("*Drayer*"). Under § 2241(c)(3), the provision frequently cited as governing habeas review in extradition cases, federal courts are authorized to grant habeas to prisoners "in custody in violation of the Constitution or laws or treaties of the United States." *See, e.g., Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (relying on § 2241(c)(3) in habeas review of extradition proceedings); *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir. 1983) (identifying § 2241(c)(3) as "the appropriate device" for judicial review of a constitutional challenge to a certification of extraditability under § 3184). Accordingly, in habeas review of extradition proceedings, courts consider defenses to extradition arising from the applicable treaty, *see, e.g., Murphy v. United States*, 199 F.3d 599, 602-03 (2d Cir. 1999); *Quinn v. Robinson*, 783 F.2d 776, 787-90, 811-14 (9th Cir. 1986); *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir. 1984), as well as constitutional claims against the U.S. government related to its conduct of extradition proceedings, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936); *Drayer*, 190 F.3d at 415; *Valenzuela v. United States*, 286 F.3d 1223, 1229-30 (11th Cir. 2002); *Matter of Burt*, 737 F.2d 1477, 1483-84 (7th Cir. 1984). Petitioner's claims, including the two defenses to extradition derived from the 1978 Treaty and the two constitutional claims against the U.S. government, therefore fall within the scope of habeas review of the extradition proceedings.

In reviewing the district court's ruling on the habeas petition below, we apply *de novo* review to questions of law and mixed questions of law and fact, and we review factual findings for clear error.  *Quinn*, 783 F.2d at 792; *see also Hilton v. Kerry*, 754 F.3d 79, 86 (1st Cir. 2014) (explaining that questions of law are reviewed *de novo* and factual findings are reviewed for clear error).

**I.       Article 7:  Statute of Limitations**

The first claim raised by Petitioner is that his extradition is precluded under Article 7 of the 1978 Treaty based on the expiration of the five-year statute of limitations for second-degree murder under U.S. federal law.  In Article 7, the United States and Mexico agreed:

> Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.

1978 Treaty, art. 7, 31 U.S.T. 5059.

When interpreting a treaty, courts "first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992); *AirFrance v. Saks*, 470 U.S. 392, 396-97 (1985) ("The analysis must begin . . . with the text of the treaty and the context in which the written words are used."); *see also Restatement (Third) of Foreign Relations Law of the United States* ("*Restatement*") § 325(1) (1986) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose."). "[T]he obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties." *Valentine*, 299 U.S. at 10.

There is no dispute that Article 7 incorporates the relevant statute of limitations in each country.  Petitioner concedes that the Mexican statute of limitations has not yet run.  If, however, his prosecution for the charged murders would be barred in the United States by the statute of limitations, then his extradition must be denied.  *See* 1978 Treaty, art. 7.

In the international extradition context, American courts look to the federal statute of limitations as the pertinent source of law in the United States.  *Theron v. United States*, 832 F.2d 492, 498-99 (9th Cir. 1987) (collecting cases).  The government argues that Petitioner's crime

should be analogized to first-degree murder, which is not subject to any limitations period under federal law. 18 U.S.C. §§ 1111(a), 3281. Petitioner argues that because he was not charged with premeditated murder, the more appropriate analogue is second-degree murder, which carries a five-year limitations period. §§ 1111(a), 3282. We assume *arguendo* that § 3282 applies, but hold that Petitioner is not entitled to relief because the Mexican arrest warrant issued on February 24, 2006 tolled the statute of limitations. *See Sainez v. Venables*, 588 F.3d 713, 715-17 (9th Cir. 2009).

Petitioner argues that the limitations period should be tolled only if Mexico has taken steps that would result in tolling under applicable Mexican law. His argument cannot be squared with the language of the 1978 Treaty. Article 7 offers a defense against extradition if prosecution would be "barred by lapse of time *according to the laws* of the requesting *or* requested Party." 1978 Treaty, art. 7 (emphasis added). This language incorporates the body of relevant law in each country. Thus, where a person facing extradition invokes the U.S. statute of limitations, U.S. law governs. Under § 3282(a), the limitations period is tolled if "the indictment is found or the information is instituted within five years" after the commission of the offense.

Mexico, of course, did not issue an "indictment" or institute an "information" charging Petitioner with the crime. Applying the rubric of U.S. law to the actions of a foreign government, by necessity, relies on a more functional analysis. The Ninth Circuit, faced with the same question, held that "for the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of limitations." *Sainez*, 588 F.3d at 717. We agree. The Mexican arrest warrant issued in this case is a charging document: it identifies the offense in the Oaxacan criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge. *Cf. Hamling v. United States*, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").

The Oaxacan judge issued the warrant for Petitioner's arrest on February 24, 2006, less than two months after the shootings. Because the Mexican government initiated criminal

proceedings well within the five year period specified in § 3282, Petitioner's extradition is not barred by the statute of limitations.

## II.     Article 7:  Speedy Trial Clause

Petitioner also raises the alternative argument that if his extradition is not barred by the statute of limitations under Article 7, then it is barred by the Speedy Trial Clause of the Sixth Amendment, which also protects against untimely prosecution.  Whether Article 7 incorporates the Speedy Trial Clause is a question of treaty interpretation that this Court reviews *de novo*. *Quinn*, 783 F.2d at 792.

### A.     Treaty Interpretation

We begin with "the text of the treaty and the context in which the written words are used." *Air France*, 470 U.S. at 396-97.  The Supreme Court has analogized to contract law and statutory interpretation in articulating methods of treaty interpretation; in both cases, the ordinary meaning of the text and the apparent intent of the provision are the touchstones of interpretive analysis.  *See Medellín v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); *Air France*, 470 U.S. at 399 (holding that courts must "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties").  A classic formulation of the principles governing treaty interpretation, accepted both in international law and in American courts, directs that "[a]n international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose." *Restatement* § 325(1) (quoted in *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006)); *see also* Vienna Convention on the Law of Treaties, May 23, 1969, art. 31(1), 1155 U.N.T.S. 331 (same). Applying these principles to the 1978 Treaty, we agree with Petitioner that the rights guaranteed by Article 7 to those facing extradition include the protection against unduly prejudicial post-accusation delay in criminal prosecutions embodied in the Speedy Trial Clause.

Again, Article 7 of the 1978 Treaty provides that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested

Party." 1978 Treaty, art. 7. Read for its ordinary meaning, this language incorporates those bodies of law in either country that protect against untimely criminal prosecution. The Speedy Trial Clause of the Sixth Amendment falls cleanly within this scope. In accordance with that fundamental constitutional guarantee, a criminal prosecution "become[s] barred by lapse of time according to the laws" of the United States—to borrow the language of Article 7—when unjustified post-accusation delay results in prejudice to the defendant, or when it extends over so significant a period that prejudice will be presumed.[1] *Doggett v. United States*, 505 U.S. 647, 651, 657-58 (1992); *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967) (holding that the right to a speedy trial "is one of the most basic rights preserved by our Constitution"). Although the passage or lapse of time alone is not dispositive of the merits of a speedy trial challenge, the same may be said of statutes of limitation. Both bodies of law take into account the timely or untimely action of the government, as illustrated by our earlier discussion of tolling. Similarly, defendants may be precluded from relying on either defense if the delay results from their intentional evasion of law enforcement. *See* 18 U.S.C. § 3290; *Doggett*, 505 U.S. at 652-54 (analyzing whether the defendant was aware of the charges against him during the eight years that elapsed before his discovery and arrest). Although these caveats introduce additional factors into the analysis, the essential force and fundamental basis of both the Speedy Trial Clause and statutes of limitation is the same: the passage or "lapse" of time.

Indeed, under our legal system, protection against untimely prosecution is incomplete without the Speedy Trial Clause, which operates in concert with statutes of limitation and the Due Process Clause to protect against oppressive prosecutorial delay. *See United States v. Marion*, 404 U.S. 307, 320-25 (1971) (discussing the interlocking protection provided by statutes of limitation, the Speedy Trial Clause, and the Due Process Clause); *see also United States v. Lovasco*, 431 U.S. 783, 788-89 (1977) (same); *Klopfer*, 386 U.S. at 226 (noting that each of the

---

[1]Contrary to the dissent's inexplicable interpretation, no word or turn of phrase in Article 7 suggests that its application is restricted to the commencement of criminal proceedings—indeed, the express inclusion of lapse-of-time protection against the "enforcement of the penalty" for an offense settles any doubt that the scope of the article extends beyond the initiation of prosecution. 1978 Treaty, art. 7; *cf.* Dissent at 30, 39. The dissent mischaracterizes the Oaxacan statute of limitations as supporting its interpretation, glossing over the statutory language that specifically protects against undue delay during criminal proceedings. Rather than dropping out of the picture at the commencement of the prosecution, the Oaxacan statute of limitations "reset[s] and begin[s] anew[] at the time of the reading of the charges at arraignment." (R. 2-19 at 378.) This effectively secures to criminal defendants protection comparable to the Speedy Trial Clause under U.S. law. Article 10(2), also cited by the dissent, offers no guidance because it does not even mention the phrase "lapse of time," much less purport to define or limit it. 1978 Treaty, art. 10(2).

fifty states guarantees the right to a speedy trial). The Eleventh Circuit explained the complementary roles played by statutes of limitation and the Speedy Trial Clause in protecting against prejudice arising from the "lapse of time" in *Stoner v. Graddick*, 751 F.2d 1535 (11th Cir. 1985):

> The statute of limitations is the principal device, created by the people of a state through their legislature, to protect against prejudice arising from a lapse of time between the commission of a crime and an indictment or arrest. Statutes of limitation represent legislative assessments of relative interest of the state and the defendant in administering and receiving justice. Limitations statutes, however, are not the only available protection against prejudice. The particular provisions of the Speedy Trial Clause of the Sixth Amendment are available with respect to prejudicial delay after formal indictment or information, or actual arrest.

751 F.2d at 1540-41 (citations and quotation marks omitted). Where the text of Article 7 does not distinguish among lapse of time defenses, we give the provision full effect only by construing it to incorporate these complementary protections.

Not only is the Speedy Trial Clause a central component of American legal protections against untimely prosecution, it is well established that criminal defendants may raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition. *Doggett*, 505 U.S. at 651-58 (finding speedy trial violation where U.S. government did not request the defendant's extradition from Panama and did not seek to confirm his location during the following eight years); *United States v. Heshelman*, 521 F. App'x 501, 505-510 (6th Cir. 2013) (holding that the U.S. government's failure over more than three years to pursue extradition of suspect living in Switzerland, where the suspect was not informed of the charges against him, constituted a speedy trial violation); *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008) ("[T]he government was required to make some effort to notify Mendoza of the indictment, or otherwise continue to actively attempt to bring him to trial, or else risk that Mendoza would remain abroad while the constitutional speedy-trial clock ticked. However, the government made no serious effort to do so."). If the roles of the two countries here were reversed, there is no question that Petitioner would be able to invoke his constitutional speedy trial right in a U.S. prosecution based on the government's failure to timely seek his extradition from Mexico, and indeed he would stand a good chance of succeeding in his challenge and thereby barring his prosecution. *See Doggett*, 505 U.S. at 651-58 (finding a speedy trial violation in comparable

circumstances).  Article 7 incorporates precisely that result:  if Petitioner's criminal prosecution would be barred due to the lapse of time in the United States, his extradition *must* be refused. *See* 1978 Treaty, art. 7 (forbidding extradition where criminal prosecution "has become barred by lapse of time according to the laws of the requesting *or requested party*" (emphasis added)).

Interpreting Article 7 to incorporate constitutional limits on oppressive prosecutorial delay is consistent with the protective purpose of the provision and its context within the 1978 Treaty.  We cannot agree with the government that the sole relevant purpose here is the reciprocal surrender of suspected criminals.  Article 7, after all, is plainly designed to serve other ends, as it limits extradition rather than enabling it.  The apparent "object and purpose" of the provision is to provide persons facing extradition the same degree of protection against stale prosecution that the laws of the United States or of Mexico would grant in a domestic criminal prosecution.  *See Restatement*, § 325(1).  The two countries may also quite reasonably have sought to incentivize the timely extradition and prosecution of criminals.  *See Barker v. Wingo*, 407 U.S. 514, 520 (1972) (identifying "a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused").  Construing Article 7 to incorporate Sixth Amendment protection against post-accusation prosecutorial delay furthers these purposes.

The context offered by the remainder of the 1978 Treaty confirms the nature of the two countries' endeavor.  The treaty contains numerous exceptions and limitations protective of the rights of those facing extradition.[2]  Given these many exceptions, the treaty's purpose is best understood as an effort to establish a practice of equitable, reciprocal extradition consistent with the laws of the two nations involved.  Our interpretation of Article 7 is in accordance with this purpose.

For all these reasons, one could make an argument that the "lapse of time" language in Article 7 unambiguously incorporates the Sixth Amendment's Speedy Trial Clause.  But given

---

[2]*See* 1978 Treaty, art. 1 (incorporating the principle of dual criminality); art. 3 (requiring evidence that is sufficient "according to the laws of the requested Party" to justify commitment of the person sought for trial on the charge); art. 5 (stating an exception for political and military offenses); art. 6 (incorporating a double jeopardy principle); art. 7 (incorporating defenses against untimely prosecution); art. 8 (allowing the parties to refuse extradition based on the possible application of the death penalty in certain circumstances); art. 9 (permitting the parties to decline to surrender their own nationals); art. 17 (incorporating the rule of specialty to confine the subsequent prosecution to the charges underlying the extradition).

the dissent of our colleague and the broader context of analogous provisions in other treaties, we recognize that fair-minded jurists could dispute that conclusion. We will therefore assume without deciding that the language in question is ambiguous because the ultimate result is the same either way.

Consistent with the principle that treaties should be liberally construed to effect the intent of the parties, the Supreme Court has instructed that "[i]n choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements," and, in the same vein, that "[i]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) (citing *Jordan v. Tashiro*, 278 U.S. 123, 127 (1928); *Asakura v. City of Seattle*, 265 U.S. 332, 339-40 (1924); *Tucker v. Alexandroff*, 183 U.S. 424, 437 (1902); *In re Ross*, 140 U.S. 453, 475 (1891); *Geofroy v. Riggs*, 133 U.S. 258, 271-72 (1890)); *see also see also Nielsen v. Johnson*, 279 U.S. 47, 52, 57-58 (1929) (same). These sound principles direct us to reject a "narrow and restricted construction" of Article 7, resolving ambiguity in favor of a broader reading of the rights it grants to persons facing extradition.[3]

---

[3]The dissent mistakenly reads *Factor* as requiring a blanket presumption in favor of the rights of the signatory countries and therefore in favor of extradition. Other cases relying on the same language favoring broad construction of rights granted by a treaty make clear that the rights accorded liberal construction under this presumption include rights granted to individuals rather than governments. *See Nielsen v. Johnson*, 279 U.S. 47, 52, 57-58 (1929); *Jordan v. Tashiro*, 278 U.S. 123, 127 (1928); *Asakura v. City of Seattle*, 265 U.S. 332, 339-40 (1924); *Geofroy v. Riggs*, 133 U.S. 258, 271-72 (1890). Contrary to the dissent's representations, *Factor* announced no broad default rule in favor of extradition in interpreting any extradition treaty. It merely applied existing principles of treaty interpretation—principles that emphatically do not presume that the rights of foreign governments must always be given precedence over individual rights accorded by a treaty. *See Factor*, 290 U.S. at 293-94 (citing well-settled principles of treaty interpretation); *Nielsen*, 279 U.S. at 52, 57-58; *Jordan*, 278 U.S. at 127.

In contrast to the protective clause at issue in this case, *Factor* focused extensively on treaty language authorizing extradition for different categories of offenses, which it ultimately found dispositive. The Supreme Court rebuffed the petitioner's attempt to read a limitation into the authorizing language for his offense that the conduct must be criminally punishable in both countries—a limitation that, though absent from the pertinent category for his case, *was* expressly included as to other categories of extraditable offenses. 290 U.S. at 287-93. Though the Court also discussed a proviso requiring "such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial," it held that this language was read "naturally to refer to the procedure to be followed . . . and particularly to the quantum of proof—the 'evidence'—which is to be required" to sustain an extradition request. *Id.* at 290-91. Indeed, Article 3 of the 1978 Treaty, entitled "Evidence Required," contains nearly identical language. *See* 1978 Treaty, art. 3 ("Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place.").

Courts also look to historical evidence of the drafters' intent "to resolve ambiguities in the text." *Air France*, 470 U.S. at 400; *see also Medellín*, 552 U.S. at 506-07 (instructing that although "[t]he interpretation of a treaty . . . begins with its text," the Court also relies on historical material related to the treaty as "aids to its interpretation" (internal quotation marks omitted)); *United States v. Stuart*, 489 U.S. 353, 366 (1989) ("Nontextual sources [] often assist us in giving effect to the intent of the Treaty parties, such as a treaty's ratification history and its subsequent operation." (citation and internal quotation marks omitted)).  These sources reinforce our conclusion that Article 7 incorporates the Speedy Trial Clause.

First, Article 7 uses notably broader language than the corresponding provision in the previous extradition treaty with Mexico, suggesting an intent to expand protection against untimely extradition.  The prior treaty forbade extradition in cases where criminal prosecution for the offense would be "barred *by limitation* according to the laws of the country to which the requisition is addressed."  Extradition Treaty, U.S.-Mexico, art. III, Feb. 22, 1899, 31 Stat. 1818 (emphasis added).  Additionally, at the time of the negotiations, the only published case in the United States addressing whether similar language could be interpreted to include the Speedy Trial Clause was *In re Extradition of Mylonas*, 187 F. Supp. 716 (N.D. Ala. 1960), which found it a matter of common sense that an analogous provision did incorporate the constitutional right. *Id.* at 721 (applying a provision incorporating defenses based on the "lapse of time or other lawful cause").  In the context of prior treaty language and the then-recent *Mylonas* holding, the choice to broaden the language in the 1978 Treaty supports an interpretation permitting timeliness challenges based on defenses other than the statute of limitations, including the right to a speedy trial.

Reading the language of Article 7 in light of its context and purpose and construing broadly the rights granted therein consistent with the principles of treaty construction, we hold that the lapse of time protections in U.S law incorporated by that provision include the protection against post-accusation prosecutorial delay found in the Speedy Trial Clause.

**B. The Dissent**

The dissent's interpretation of Article 7 is untenable. Unable to muster a coherent textual basis for its restrictive reading of the provision,[4] the dissent instead relies on a cascade of inapposite citations. The difficulty is that, with the exception of *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), and a handful of unpublished district court cases from California, none of the multitude of cases, treaties, or texts cited by the dissent considers, much less rejects, the possibility that a clause incorporating "lapse of time" defenses in an extradition treaty may include constitutional speedy trial protections. Instead, most of these citations merely point to the use of the term "lapse of time" in some proximity to the statute of limitations. *See, e.g.*, Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866 (providing, in an article titled "Lapse of Time" that "[e]xtradition shall not be denied on the ground that the prosecution or the penalty would be barred under the statute of limitations in the Requested State"); *Black's Law Dictionary* 1321 (10th ed. 2014) (referring to the lapse of time in defining a period of prescription, but in no way equating the two as synonymous); *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553 (1920) (interpreting the term "lapse of time" to incorporate statutes of limitation in a civil maritime context).

These citations prove little, if anything. Comparison with other extradition treaties that make express reference to statutes of limitation in fact highlights the comparatively broad language employed in the U.S.-Mexico Treaty at issue today. Indeed, the extradition treaties with both Argentina and the Organization of Eastern Caribbean States, cited by the dissent, mention the lapse of time and statutes of limitation in particular only to establish that a person facing extradition does *not* have recourse to those protections. *See* Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866; S. Treaty Doc. No. 105-13 (1997); Extradition Treaties, U.S.-O.E.C.S., art. 8, S. Treaty Doc. No. 105-19 (1997). The extradition treaty with France does contain language comparable to that with Mexico—but its specification about the treatment of acts of interruption emphasized by the dissent does nothing to define or limit its incorporation of defenses to prosecution based on "lapse of time." *See* Extradition Treaty, U.S.-Fr., art. 9, Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997). Nor does the UN model treaty

---

[4]*See* footnote 1, *supra*.

support our colleague's unduly restricted reading of Article 7. The model treaty in fact recommends even broader language that would mandatorily bar extradition "[i]f the person whose extradition is requested has, under the law of either Party, become immune from prosecution or punishment *for any reason*, including lapse of time or amnesty." G.A. Res. 52/88, U.N. Model Treaty on Extradition, art. 3(e) (emphasis added). Discussion of the particular intricacies posed by statutes of limitation in footnotes and ancillary documents about the model treaty does nothing to limit or define the recommended incorporation of lapse of time defenses.

Truly grasping at straws, the dissent cites to the existence of cases where litigants did not argue that a "lapse of time" provision incorporated the speedy trial right. *See* Dissent at 33 (citing twelve cases that are inapposite by definition). In the cases where the petitioner was facing extradition to Canada and Australia, the omission is entirely unsurprising: the treaties at issue incorporated only the lapse of time provisions of the countries *requesting* extradition, so U.S. timeliness protections were not at issue in the posture of the cases under review. *Murphy*, 199 F.3d at 602-03 (Canada); *Drayer*, 190 F.3d at 415 (Canada); *Kamrin*, 725 F.2d at 1227-28 (Australia). And in *In re Extradition of Kraiselburd*, 786 F.2d 1395 (9th Cir. 1986) (Argentina), another case cited by the dissent in the same passage, the petitioner did in fact raise a Speedy Trial claim, though he sought to ground it in more general language granting an extraditee "the right to use such remedies and recourses as are provided by" the law of the requested party—a position the Ninth Circuit found foreclosed by precedent summarily rejecting a similar argument. 786 F.2d at 1398 (citing *Kamrin*, 725 F.2d at 1227-28). In any event, the fact that a particular argument was not made in a particular case offers no sound guidance, much less authority, for the question before us today.

Similarly, the unpublished district court opinions cited by the dissent are neither authoritative nor persuasive. Lacking direct authority on whether Article 7 incorporates the speedy trial right, each of these cases conflates the issue with precedent addressing whether there is an inherent right to a speedy extradition, or whether the speedy trial right is incorporated by generic "remedies and recourses" language. *See Gonzalez v. O'Keefe*, No. C 12-2681, 2014 WL 6065880, at *2-4 (N.D. Cal. Nov. 12, 2014); *In re Extradition of Flores Ortiz*, No. 10-MJ-2016-

*JMA*, 2011 WL 3441618, at \*5-6 (S.D. Cal. Feb. 9, 2011); *In re Extradition of Salazar*, No. 09MJ2545-BLM, 2010 WL 2925444, at \*6 (S.D. Cal. July 23, 2010); *United States v. Garfias*, No. CR-09-xr-90128, 2009 WL 2580641, at \*2-3 (N.D. Cal. Aug. 20, 2009). Such cases do not offer us any guidance.

The sole appellate case on point, *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), offers no more intellectually robust support for the dissent's position. There, the Eleventh Circuit relied on the same definition-by-proximity method of reasoning as the dissent to conclude that the phrase "lapse of time" referred primarily, and ultimately exclusively, to the statute of limitations. 26 F.3d at 1566. Both *Yapp* and the dissent cite to a comment to *Restatement* § 476 that discusses the applicability of statutes of limitation under various formulations of "lapse of time" protections against extradition. *Id.* at 1567 (citing *Restatement* § 476, comment (e)). That comment, however, does not purport to restrict the term "lapse of time" to statutes of limitation. Significantly, the same *Restatement* elsewhere indicates that the phrase "lapse of time" may encompass other defenses, such as laches:

> *c. Lapse of time.* No general rule of international law limits the time within which a claim can be made. However, international tribunals have barred claims because of a delay in presentation to the respondent state *if the delay was due to the negligence or laches of the claimant state*.

*Restatement* § 902, comment (c) (emphasis added). Of course, § 902 addresses interstate claims and remedies rather than extradition; nonetheless, it demonstrates that the phrase "lapse of time" may easily be used in connection with a broader set of claims and defenses than simply statutes of limitation.

Indeed, "lapse of time" is a phrase frequently used in American law in connection with any number of legal doctrines that operate based on the passage of time. For example, the term is frequently used with reference to laches and due process claims deriving from alleged unjustifiable delay. *See, e.g.*, *King v. Alaska S.S. Co.*, 431 F.2d 994, 996 (9th Cir. 1970) ("[T]he right to bar an action for lapse of time is a substantive right. It is conceded that the relevant lapse of time standard in maritime law is the doctrine of laches." (citation omitted)); *Costello v. United States*, 365 U.S. 265, 281 (1961) ("In contending that lapse of time should be deemed to bar the Government from instituting this proceeding, the petitioner argues that the doctrine of

laches should be applied to denaturalization proceedings, and that in any event, the delay of 27 years . . . denied him due process of law in the circumstances of the case."). In other circumstances, "lapse of time" is used in reference to rights that are claimed to have vested based on the passage of time. *See, e.g.*, *Chase Secs. Corp. v. Donaldson*, 325 U.S. 304, 311-12 (1945) ("[W]here lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations."); *Fed. Trade Comm'n v. Algoma Lumber Co.*, 291 U.S. 67, 79-80 (1934) (holding that misleading advertising was still actionable thirty years after initial use because "[t]here is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for deception or mistake . . . ."). Additionally, the concept of "lapse of time" is sometimes invoked in arguments about proper judicial procedure or the proofs required to meet an evidentiary standard. *See, e.g.*, *Davis v. Adult Parole Auth.*, 610 F.2d 410, 414-15 (6th Cir. 1979) (discussing other courts' holding that "the lapse of time affects the quantum of required proof as well as the good faith and credibility of the moving party" (internal quotation marks omitted)); *Berkshire Land Co. v. Fed. Sec. Co.*, 199 F.2d 438, 441 (3d Cir. 1952) ("The presumption of payment arising from lapse of time does not work an extinguishment of the debt, nor, unlike the bar of the statute of limitations, does it require a new promise or its equivalent to revive it." (internal quotation marks omitted)).

Finally, and of course most relevantly here, "lapse of time" is used in reference to constitutional speedy trial claims. *See, e.g.*, *Doggett*, 505 U.S. at 658-69 (O'Connor, J., dissenting) ("The only harm to petitioner from the lapse of time was potential prejudice to his ability to defend his case."); *Robinson v. Whitley*, 2 F.3d 562, 569 (5th Cir. 1993) ("[A] defendant will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court . . . . In such a situation, the speedy trial clock is properly tolled." (internal quotation marks omitted)); *United States v. Greene*, 737 F.2d 572, 575, n.2 (6th Cir. 1984) ("Greene makes no contention to this Court that the lapse of time from May 10, 1983 until August 22, 1983 when the initial trial began, or the time period from August 25, 1983 when a mistrial was declared, until October 24, 1983 when the second trial began, infringed upon his constitutional or statutory rights."); *United States v. Hauff*, 461 F.2d 1061, 1063 (7th Cir. 1972) ("With regard to the lapse of time between the accusation and the trial, the Speedy Trial Clause

guarantees to a criminal defendant [] that the Government will move with the dispatch which is appropriate to assure him an early and proper disposition of the charges against him." (internal quotation marks omitted)); *Moser v. United States*, 381 F.2d 363, 364 (9th Cir. 1967) (holding that the defendants' speedy trial claim failed where they did not "assert, nor does anything in the trial record tend to show, that because of the lapse of time they were prejudiced in making their defense"); *see also Burns v. Lafler*, 328 F. Supp. 2d 711, 719 (E.D. Mich. 2004) ("To prosecute a defendant following an investigative delay does not deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time.").

All of the above completely deflates the dissent's hyperbolic statement that "[t]oday's decision brings more than two centuries of settled understanding to an end." Dissent at 29. The issue can hardly be considered "settled" with only one appellate decision directly on point (*Yapp v. Reno*), a decision that we believe was wrongly decided for the reasons just stated. Similarly unconvincing is the dissent's view that only a *fixed* time limit is consistent with Article 7's "lapse of time" provision. Dissent at 29. The dissent cites no authority to support this novel proposition, and we have found none.

Fretting over the potential breadth of Article 7, the dissent next suggests that our interpretation would incorporate the Speedy Trial Act and professes concern that its provisions would be difficult to apply in extradition proceedings. This concern is misplaced because Article 7 does not incorporate the statutory right—the dissent's mischaracterization of our opinion notwithstanding. In contrast to the constitutional right, violations of the Speedy Trial Act do not "bar" a prosecution—that is, *require* that the charges be dismissed with prejudice. *See* 18 U.S.C. § 3162 (leaving decision of whether to dismiss with prejudice to the discretion of the district court). The discretionary remedy provided by statute is inconsistent with the language of Article 7, which incorporates mandatory bars to prosecution. And even assuming *arguendo* that the statute somehow did fall within Article 7, it contains an exclusion for "[a]ny period of delay resulting from the absence or unavailability of the defendant" that would render the seventy-day clock essentially irrelevant in extradition cases. 18 U.S.C. § 3161(h)(3). The dissent's alarmism is thus entirely without basis.

The dissent also argues that comity requires a narrow interpretation of Article 7, but it fundamentally misunderstands the nature of the comity principles it cites. It suggests that we should be guided by the principle that American courts must avoid "supervising the integrity of the judicial system of another sovereign nation." Dissent at 35 (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d. Cir. 1986)). This principle, known as the rule of non-inquiry, bars courts "'from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters.'" *Hilton*, 754 F.3d at 83-84 (quoting *Khouzam v. Att'y Gen. of United States*, 549 F.3d 235, 253 (3d Cir. 2008)). This rule has a narrow scope and is typically cited only to bar inquiry into humanitarian concerns or a lack of procedural rights in a foreign criminal justice system. *See Hilton*, 754 F.3d at 83; *Khouzam*, 549 F.3d at 253; *Prasoprat v. Benov*, 421 F.3d 1009, 1016-17 (9th Cir. 2005); *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see also Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair."). Comity principles cannot broaden the authority to extradite beyond the terms of the treaty. *Tucker*, 183 U.S. at 436.

Although courts do not inquire into the fairness of criminal procedure or punishment under the laws of the country seeking extradition, it is plainly a court's role to determine whether extradition is permissible under the terms of the governing treaty. *Valentine*, 299 U.S. at 8-9. Similarly, the executive's discretion to grant or deny extradition arises only after a person has been certified as extraditable under the governing treaty. *Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006). Nor, contrary to the dissent's suggestion, is it in any way inappropriate in our constitutional system for courts to enforce individual rights granted by a treaty in the appropriate exercise of habeas jurisdiction. *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("[T]he Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions.").[5]

---

[5]The dissent cites *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2094-96 (2015) to suggest that our holding today treads on the executive's prerogative, but that case cannot be pressed into such inappropriate service. The Court emphasized that "[i]n foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" *Id.* at 2087 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)). Extradition, far from constituting a power solely within the

It is fundamental that "[t]here is no executive discretion to surrender [an individual] to a foreign government, unless that discretion is granted by law"—in this case, by the terms of the 1978 Treaty. *Valentine*, 299 U.S. at 9. Article 7 states a mandatory rule that extradition *shall* be denied where the prosecution would be barred due to lapse of time; and "it is our duty to interpret [the treaty] according to its terms," without "add[ing] to or detract[ing] from them." *Id.* at 11. Where a person facing extradition raises a valid defense under the terms of the treaty, a court with proper jurisdiction may not ignore his claim.[6]

As a final argument against applying the Speedy Trial Clause in the extradition context, the dissent raises the specter of the nonappealability of extradition decisions to suggest that the speedy trial right in Article 7 will be applied in meritless cases. This concern is overstated and misleading. In any extradition case, no matter the defense raised or rejected, the magistrate judge's decision is not subject to a direct appeal. Our extradition framework entrusts magistrate judges with the responsibility to fairly apply the terms of the treaty, and to deny extradition when the treaty so requires—whether because the crime does not qualify under the treaty, because the requesting party has not established probable cause, or because extradition has become barred by the lapse of time. The dissent cites to *In re Extradition of Mackin*, 668 F.2d 122, 126-30 (2d Cir. 1981) (Friendly, J.), seemingly for the notion that extradition decisions leave the losing party without recourse. But that proposition is clearly wrong given that we are sitting in habeas review of just such a decision in this case. What *Mackin* actually says is that although "decisions . . . denying or granting requests for extradition are not appealable *under 28 U.S.C. § 1291*," *id.* at 127 (emphasis added), parties to an extradition decision may seek alternative means of redress. "[T]he extraditee in cases of grant and the requesting party in cases of denial have alternative, albeit less effective, avenues of relief. The extraditee may seek a writ of habeas corpus, the

---

authority of the executive, is a power governed by binding treaty provisions and constitutional norms that courts must enforce in the cases properly before them. *Valentine*, 299 U.S. at 9-11.

[6] For this reason, the dissent's citation to *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001) is irrelevant. *See* Dissent at 31. That case addressed the question of whether an enforceable individual right existed under the Vienna Convention, *see id.* at 389-90, 392, an issue long settled in the extradition context, where extraditees have the right to test the legality of their extradition under the governing treaty by means of a petition for a writ of habeas corpus, *Valentine*, 299 U.S. at 18; *United States v. Rauscher*, 119 U.S. 407, 418-19, 430-31 (1886); *Drayer*, 190 F.3d at 412 n.2; *see also Murphy*, 199 F.3d at 602-03; *Quinn*, 783 F.2d at 787-90, 811-14; *Kamrin*, 725 F.2d at 1227. There is no question that Article 7 confers an individually enforceable right to avoid extradition where the requirements of the article are met; our only task is to interpret its terms.

denial or grant of which is appealable, and the requesting party may refile the extradition request." *Id.* at 128 (citation omitted).

And the dissent's fear that our holding will serve as a beacon guiding forum-shopping fugitives to our circuit is similarly overblown. Our decision today puts us at odds with the Eleventh Circuit's opinion in *Yapp*, but the complications of a circuit split are nothing unusual. The complications are instead a routine consequence of the federal system's regional hierarchy, where differences can be resolved by the Supreme Court. In any event, these concerns do not outweigh Petitioner's rights under the treaty and the United States Constitution.

## C. Petitioner's Speedy Trial Claim

To determine whether the lapse of time between accusation and trial constitutes a violation of the Sixth Amendment, courts balance "'whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.'" *United States v. O'Dell*, 247 F.3d 655, 667 (6th Cir. 2001) (quoting *Doggett*, 505 U.S. at 651). If the government uses "reasonable diligence" in seeking to bring an accused to justice, a speedy trial claim will generally fail "as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense." *Doggett*, 505 U.S. at 656. "[O]fficial bad faith in causing delay will be weighed heavily against the government," resulting in dismissal if the delay is significant. *Id.* Where delay results from "official negligence in bringing an accused to trial," the need for the defendant to show prejudice from delay lessens with the length of time elapsed. *Id.*

On the record before us, it is clear that Petitioner has a speedy trial claim that is at least facially viable. More than six years elapsed between the alleged shooting on December 31, 2005 and Mexico's informal request for his extradition in May 2012, and another year and three months passed before Mexico formalized its extradition request with the delivery of a complete packet in August 2013. The Supreme Court has held that a delay of this magnitude raises a presumption of prejudice that may justify relief. *Doggett*, 505 U.S. at 658. Additionally, it appears that Petitioner left Mexico without any knowledge that he was charged with a crime, and

there is at least circumstantial evidence of negligence and unjustified failure to prosecute on the part of the Mexican government.

We do not, however, have the benefit of a district court decision making factual findings on these issues or analyzing the application of the *Barker* factors. Nor has the government been asked to present evidence that Mexico diligently sought Petitioner during the period that he was living in the United States. Remand is therefore necessary. The government argues to this Court that it would be infeasible or improper to conduct the fact-finding necessary to adjudicate a speedy trial claim. Resp.'s Br. at 39. Yet, the administrative challenges are not nearly so grave as the government would suggest. Application of the *Barker* factors in an extradition setting is not likely to result in a searching inquiry into the actions of foreign officials. In most cases, introduction of evidence that the requesting country pursued the suspect with "reasonable diligence" will end the inquiry, since under *Doggett* a showing of diligence will nearly always defeat a speedy trial claim "however great the delay." 505 U.S. at 656. In other cases, where the extraditee is alleged to be a fugitive from justice, the speedy trial analysis will be comparable to the analysis already implemented by courts considering claims that the person's flight from justice tolled the statute of limitations. *See* 18 U.S.C. § 3290; *Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir. 1976).

The 1978 Treaty offers a ready mechanism, in the form of Article 12, for the United States to obtain the evidence necessary to make such a showing. That provision anticipates that there may be cases where the executive of the requested country "considers that the evidence furnished in support of the request for extradition is not sufficient to fulfill the requirements of [the] Treaty," and therefore provides that in such cases the requested country "shall request the presentation of the necessary evidence." 1978 Treaty, art. 12. It is worth noting that this is not a discovery rule but rather a diplomatic mechanism; there is no risk that Mexico will be forced to offer up evidence of bad-faith delay for review by an American court. Additionally, in light of the relaxed rules of evidence applicable in extradition hearings, proof of Mexico's diligence may be presented in any reasonably reliable form adequate to document the country's efforts in seeking Petitioner.

We therefore remand this case to the district court to conduct the *Barker* analysis in the first instance, after taking such relevant evidence as may be offered by the parties.

## III. Petitioner's *Brady* Rights

Petitioner also raises a constitutional due process claim against the U.S. government under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing that he was entitled to disclosure of U.S. consular records related to the 2009 communications between the United States and Mexican authorities about the Oaxacan arrest warrant in his case. In *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993), this Court expressly extended *Brady* "to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against." As the Supreme Court has recognized, "*Brady* claims have ranked within the traditional core of habeas corpus." *Skinner v. Switzer*, 562 U.S. 521, 131 S. Ct. 1289, 1300 (2011). The government "violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). Evidence is "material" under *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.*

The scope of the government's *Brady* obligations extends to evidence material to an affirmative defense or the ability of a defendant to assert his constitutional rights. *See, e.g.*, *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process.") (holding that *Brady* obligations included disclosure of a report that was material to defendants' standing to pursue a Fourth Amendment suppression motion); *accord Nuckols v. Gibson*, 233 F.3d 1261, 1266 (10th Cir. 2000) (finding a *Brady* violation where prosecution withheld evidence that was material to whether the defendant's confession should have been suppressed). The district court's ruling that the government was not required to disclose the documents related to the 2009 communications between the United States and Mexico rested on its belief that Petitioner could not assert a speedy trial defense to extradition under the treaty. As discussed above, that premise was in error. Petitioner is entitled to receive evidence in the

government's possession that is material to his Article 7 defense to extradition based on the Speedy Trial Clause.

Nor is this outcome anomalous, contrary to the government's strenuous effort to cast doubt on this Circuit's binding precedent in *Demjanjuk*. Courts have unanimously held that the government is bound by principles of due process in its conduct of extradition proceedings. *Valenzuela v. United States*, 286 F.3d 1223, 1229 (11th Cir. 2002) ("[T]he judiciary must ensure that the constitutional rights of individuals subject to extradition are observed.") (granting habeas on a due process claim arising from the government's introduction of evidence in violation of a confidentiality agreement); *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir. 1983) (remanding for consideration of a due process claim based on the government's violation of immunity agreement); *Petition of Geisser*, 627 F.2d 745, 750 (5th Cir. 1980) (agreeing that noncompliance with a plea bargain is a valid constitutional claim that may be raised to challenge extradition proceedings and that "a purported treaty obligation of the United States government cannot override an individual constitutional right"). Just as the government does not have the discretion to surrender an individual to a foreign government without express authority granted by law, *Valentine*, 299 U.S. at 9, the government likewise cannot obtain that authorization in a particular case by withholding material evidence that is within its possession, *Demjanjuk*, 10 F.3d at 354.

Here, Petitioner seeks only documents already in the possession of the U.S. government. *Cf. Drayer*, 190 F.3d at 415 (denying a claim under *Demjanjuk* where "[t]he United States complied with its discovery obligations by turning over the materials in its possession to petitioner" and, naturally, "[i]tems that may be in the possession of Canada must be sought in a Canadian forum"). It seems likely, to say the least, that an inquiry regarding his case from the United States in 2009—three years before Mexico submitted its informal extradition request, and four years before the request was perfected by the delivery of the full extradition packet—will be material to Petitioner's speedy trial claim. If the documents are in fact material and favorable to the accused, the government must disclose them. On remand, the district court should conduct

appropriate proceedings to ensure that the government's constitutional obligations in this regard are met.[7]

## IV.    Procedural Due Process Claim

Finally, Petitioner asserts a constitutional claim that his procedural due process rights under the Fifth Amendment were violated when he was not granted a prompt hearing and judicial review of the purported "urgency" asserted to allow his arrest under Article 11 of the 1978 Treaty.  Article 11 authorizes the provisional arrest of a suspect prior to the delivery of the formal extradition request, but only "in the case of urgency."  1978 Treaty, art. 11.  The country requesting extradition must furnish the complete extradition packet within sixty days of when the individual is taken into custody; if it fails to do so, "[t]he provisional arrest shall be terminated." *Id.*

Petitioner first argued that there was no legitimate urgency to justify reliance on this procedure within days of being taken into custody, yet he was unable to receive a ruling on the issue during the sixty-day period.  (M.R. 33, Detention Order, PageID 132; H.R. 17, Transcript, PageID 196-98, 201; H.R. 15, Order, PageID 165.)  Mexico duly delivered its formal extradition request to the United States within the allotted time, and the magistrate judge eventually ruled that Petitioner's objection to the provisional arrest procedure was moot.  The lack of a timely hearing and ruling on the issue, Petitioner asserts, was in violation of his procedural due process rights under the U.S. Constitution.

While we are not unsympathetic to Petitioner's argument, his right to receive a prompt hearing and judicial review of the legality of his arrest under Article 11 has long since become a moot issue.  "[T]his Court lacks jurisdiction to consider any case or issue that has 'lost its character as a present, live controversy' and thereby becomes moot." *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)).  Mexico's extradition request was formalized within the applicable timeframe, and Petitioner does not contest the validity of his ongoing detention under the authority of Article 10.  The government now has the

---

[7]Upon a proper showing by the government, *in camera* review may be ordered to protect the confidentiality of any sensitive communications.  We echo the sentiment of the Fourth Circuit that "we have no reason to doubt that district courts can adequately protect the confidentiality of [certain sensitive] communications by considering them *in camera*." *Mironescu v. Costner*, 480 F.3d 664, 673 (4th Cir. 2007).

right to detain him for extradition whether or not it can show that his case called for urgency. Petitioner concedes this much.

Petitioner argues that although his claim may be moot, we should address the issue because it is capable of repetition yet evading review. This exception to the mootness doctrine allows a federal court to exercise jurisdiction only if two requirements are met: "'(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Demis*, 558 F.3d at 516 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (*per curiam*)).

There is no reasonable basis for anticipating that Petitioner may again be subject to provisional arrest under Article 11. He concedes that his current detention is authorized by Article 10, as supported by Mexico's formal extradition request. If Petitioner's habeas petition is granted or if the Secretary of State exercises his discretion to refuse extradition in this case, Petitioner will not again face extradition for these charges under the authority of Article 11. *Cf. Caltagirone v. Grant*, 629 F.2d 739, 750 (2d Cir. 1980) (holding that the legality of a provisional arrest was not moot where it was not yet determined that the formal extradition request was legally adequate).

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. Most people who commit crimes do not turn themselves in. They often flee, sometimes leaving the city of the crime, sometimes even the country. If a fugitive leaves the country, that complicates law enforcement efforts. One trait of sovereignty is that countries have no legal, as opposed to moral, obligation to turn criminal suspects over to another country for prosecution. The point of extradition treaties is to prevent such crimes from going unpunished by imposing a golden rule obligation on each party to the treaty—an agreement by each country to return haven-seeking fugitives to the other.

Avelino Cruz Martinez, it is fair to say, was not thinking about the golden rule when he shot two men at a New Year's Eve party in a small Mexican village. Invoking the 1978 United States-Mexico extradition treaty, Mexico asked the United States to return Cruz Martinez to Mexico to be tried for murder. Cruz Martinez filed a habeas corpus petition, claiming that his extradition would violate Article 7 of the treaty, which prohibits extradition when "prosecution" or "enforcement" of the charged offense "has become barred by lapse of time according to the laws of the requesting or requested Party." Extradition Treaty, U.S.-Mex., art. 7, May 4, 1978, 31 U.S.T. 5059. In particular, he argues that his extradition would violate (1) the relevant statute of limitations and (2) his Sixth Amendment right to a speedy trial.

I agree with the majority—and everyone else who has considered the matter—that this provision covers statute-of-limitation violations. And I agree with the majority that the relevant American and Mexican statutes of limitations do not bar Cruz Martinez's extradition. But I must part ways with the majority over its conclusion that the same phrase also incorporates the protections of the Speedy Trial Clause of the Sixth Amendment to the United States Constitution.

That innovation stands alone. The United States concluded its first extradition treaty in 1794. It has since concluded hundreds more, many of which include the phrase "barred by lapse

of time" or something similar.  For 221 years, not a single appellate court has interpreted any provision in any of those treaties—whether including these words or not—to extend the Sixth Amendment's speedy-trial right to someone facing extradition.  Indeed, virtually all of the relevant "lapse of time" cases do not even include a speedy-trial claim.  Today's decision brings more than two centuries of settled understanding to an end.  By shoehorning speedy-trial protections into the phrase "barred by lapse of time," the majority has given this mine-run extradition treaty a meaning it does not have and in the process made nearly irrelevant the one meaning everyone thought it did have.  After today's decision, rest assured, extradition fights will turn on elastic speedy-trial claims, not fixed statute-of-limitations claims.  Because every interpretive tool confirms that the phrase "barred by lapse of time" does not incorporate the constitutional speedy-trial right into this treaty, Cruz Martinez may not invoke that right to avoid standing trial in Mexico for a crime he agrees there is probable cause he committed.  The majority seeing things differently, I respectfully dissent.

A.

*Text.*  "Extradition shall not be granted," Article 7 says, "when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party."  Extradition Treaty, U.S.-Mex., art. 7, *supra*, 31 U.S.T. at 5064–65.  The language thus covers only circumstances where prosecution is "barred by lapse of time."  Put less passively, *time* must do the barring.  Yet the Sixth Amendment does not create a time bar on trial initiation—a *fixed* time after which the trial must be called off.  In contrast to statutes of limitations, which *do* set fixed time periods that bar prosecutions, the Sixth Amendment does no such thing.  As the Supreme Court has explained, the speedy-trial right is "*consistent* with delays" (and thus consistent with lapses of time) and "depends upon circumstances," as it is "impossible to determine with precision when the right has been denied" in our system of "swift but deliberate" justice.  *Barker v. Wingo*, 407 U.S. 514, 521–22 (1972) (emphasis added and internal quotation marks omitted).  The Sixth Amendment imposes not a fixed "time period" but a "relative," "amorphous," and "slippery" one.  *Id.* at 522–23.  Because the Sixth Amendment does not create a fixed time limit before a trial must start, a "lapse of time" does not "bar" criminal prosecutions.

Not only does Cruz Martinez's argument require us to add something to the Sixth Amendment that does not exist (a fixed time limit), it requires us to subtract requirements of the Sixth Amendment that do exist. A criminal defendant cannot win a Sixth Amendment challenge by pointing to a calendar and counting off the days. He must show that there was no good reason *for* the delay, that he asserted his rights *during* the delay, and that his trial was prejudiced *by* the delay. *Id.* at 530–33. Given the *four* requirements for a Sixth Amendment claim, passage of time alone will not establish a speedy-trial violation. Yet Article 7 covers only lapse-of-time failings in a prosecution. It does not cover doctrines that bar prosecution due to the passage of time *and more*. No constitutional speedy-trial case to my knowledge has held that a time delay alone caused the violation. The inquiry always requires an absence of justification at a minimum for the delay. Because the treaty provision creates a lapse-of-time bar alone and because no precedent says that delay alone establishes a speedy-trial violation under the Sixth Amendment, the provision does not apply.

Another textual clue points in the same direction. The treaty does not cover any and all "lapse[s] of time" that may occur in a criminal case. It applies only to time lapses with respect to the "prosecution" or "enforcement" of an "offense." That language naturally applies to statutes-of-limitations periods that "bar[]" the commencement of a "prosecution" or "enforcement" proceeding—which is just when extradition typically would be sought. That language also naturally applies to limitations periods that "bar[]" "penalt[ies]" already handed down from being "enforce[d]" to the extent any exist. The same is not true for guarantees that apply *after* an indictment (or its equivalent) through the end of trial. Just as this treaty provision would not cover criminal procedure guarantees that apply to a trial already begun, it does not naturally apply to speedy-trial requirements that prohibit the criminal process, once started, from continuing. The speedy-trial right after all operates not by barring the initiation of a prosecution but by preventing it from continuing, *see United States v. Marion*, 404 U.S. 307, 320 (1971), and applies not at all to the execution of sentences already pronounced, *see United States v. Melody*, 863 F.2d 499, 505 (7th Cir. 1988). These rights, like trial guarantees, usually kick in outside the two periods in which extradition limits apply: (1) the initiation of a prosecution and (2) the enforcement of a "judicially pronounced penalty of deprivation of liberty." Extradition Treaty, U.S.-Mex., art. 1(1), *supra*, 31 U.S.T. at 5061.

*Context.*  Article 7's neighbors reinforce this conclusion.  Article 10(2) of the Treaty sets forth the extradition procedures a requesting State must follow and requires every request to include "[t]he text of the legal provisions relating to the *time limit* on the prosecution or the execution of the punishment of the offense."  Extradition Treaty, U.S.-Mex., art. 10(2)(d), *supra*, 31 U.S.T. at 5066 (emphasis added).  This disclosure requirement allows the requested State to verify whether extradition is "barred by lapse of time" without embarking upon a self-guided tour of another country's laws.  Article 10(2)'s own interpretation of "lapse of time"—it means "time limit"—confirms that the language covers only statutes of limitations, not a speedy-trial right as well.  As Cruz Martinez acknowledges, a "time-bar provision" would apply only "to the operation of statutes of limitations."  Appellant's Br. 47.

*Background principles.*  In interpreting treaties, as in interpreting statutes, we consider not only text and context but also the background principles from which the language emerged. *United States v. Emuegbunam*, 268 F.3d 377, 392 (6th Cir. 2001) (interpreting a treaty "consistent with the background presumption against implying personal rights in international treaties").  Those principles come to the same end.  No extant case, treaty, or commentary endorses the notion that, for extradition purposes, the phrase "barred by lapse of time" refers to a speedy-trial guarantee on top of the limitations periods that fall naturally within its grasp.  Treaties no less than statutes must be construed against the backdrop of long-settled usage.  Courts have no license to depart from that long history.

Similar provisions in similar treaties ratified by the United States associate this phrase with limitations periods only.  Take our treaty with Argentina, which equates "lapse of time" with the expiration of a "statute of limitations."  Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866.  Or take our treaty with France, which prohibits extradition if prosecution is "barred by *lapse of time*" in the requested State but requires that State to consider "[a]cts in the [r]equesting State that would interrupt or suspend *the prescriptive period*." Extradition Treaty, U.S.-Fr., art. 9, Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997) (emphasis added); *see Black's Law Dictionary* 1321 (10th ed. 2014) (defining "period of prescription" as "[t]he period fixed by local law as sufficient for obtaining or extinguishing a right through lapse of time.  In addition to a fixed number of years, the period includes whatever further time is

allowed by local law because of infancy, insanity, coverture, and other like circumstances."). Or take our six treaties with the six countries of the Organization of Eastern Caribbean States, which authorize extradition *despite* a "lapse of time"—defined in terms of "the prescriptive laws" of the requesting or requested country. Extradition Treaties with Organization of Eastern Caribbean States, S. Treaty Doc. No. 105-19, at 11, 33, 55, 77, 98, 120 (1997). When transmitting those treaties to the Senate for its advice and consent, the President described their six identical lapse-of-time provisions as "enabl[ing] extradition requests to be granted irrespective of statutes of limitations" in any State. *Id.* at vii. None of these clauses demonstrates any desire to incorporate the Sixth Amendment into the words "barred by lapse of time."

Before ratification of this treaty, the same phrase notably had long held a similar meaning in American law—in the context of state laws applying out-of-state statutes of limitations to out-of-state causes of action. Consider the Minnesota borrowing statute upheld by the Supreme Court in *Canadian Northern Railway Co. v. Eggen*, 252 U.S. 553 (1920). The statute provided that, "[w]hen a cause of action has arisen outside of this state, and, by the laws of the place where it arose, an action thereon is there *barred by lapse of time*, no such action shall be maintained in this state unless the plaintiff be a citizen of the state who has owned the cause of action ever since it accrued." *Id.* at 558 (emphasis added). The Court characterized this statute—phrased in "precisely the same" terms as "those of several other states"—as granting a "nonresident the same rights in the Minnesota courts as a resident citizen has, *for a time equal to that of the statute of limitations* where his cause of action arose." *Id.* at 560 (emphasis added).

*Precedent.* Court decisions uniformly support my interpretation. The Eleventh Circuit faced Cruz Martinez's precise argument and rejected it. Here is what the court said: "Weighing heavily against [the defendant's] position is the fact that for over a century, the term 'lapse of time' has been commonly associated with a statute of limitations violation. . . . Thus, we hold that the 'lapse of time' provision in [the U.S.-Bahamas] Extradition Treaty refers to the running of a statute of limitations and not to a defendant's Sixth Amendment right to a speedy trial." *Yapp v. Reno*, 26 F.3d 1562, 1567–68 (11th Cir. 1994). A district court has reached the same conclusion. *See Gonzalez v. O'Keefe*, No. C 12-2681 LHK (PR), 2014 WL 6065880, at *2–4 (N.D. Cal. Nov. 12, 2014). So have several magistrate judges. *See In re Extradition of Flores*

*Ortiz*, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *5–6 (S.D. Cal. Feb. 9, 2011); *In re Extradition of Salazar*, No. 09MJ2545-BLM, 2010 WL 2925444, at *6–7 (S.D. Cal. July 23, 2010); *United States v. Garfias*, No. CR-09-xr-90128, 2009 WL 2580641, at *2–3 (N.D. Cal. Aug. 20, 2009).

No precedent still on the books goes the other way.

Also notable are the many cases where the criminal defendant *did not even raise* the speedy-trial claim, as opposed to a statute-of-limitations claim. If imitation is the sincerest form of flattery, its opposite must be the most credible form of disagreement. Many courts of appeals, including our own, have declined to hold that a lapse-of-time clause includes the right to a speedy trial. The only reason these courts did not squarely address the issue is because not one of the defendants thought the point was worth their time—and thus did not even argue that the phrase "lapse of time" included a speedy-trial right. *See Skaftouros v. United States*, 667 F.3d 144, 161–62 (2d Cir. 2011) (Greece); *Sainez v. Venables*, 588 F.3d 713, 715–17 (9th Cir. 2009) (Mexico); *Murphy v. United States*, 199 F.3d 599, 602–03 (2d Cir. 1999) (Canada); *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) (Canada); *Ross v. U.S. Marshal for E. Dist. of Okla.*, 168 F.3d 1190, 1193–95 (10th Cir. 1999) (United Kingdom); *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398–99 (9th Cir. 1986) (Kennedy, J.) (Argentina); *Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir. 1984) (Australia); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 697–99 (W.D. Tex. 2003) (Mexico); *In re Extradition of Suarez-Mason*, 694 F. Supp. 676, 686–87 (N.D. Cal. 1988) (Argentina); *In re Extradition of Liuksila*, No. 13-970 DAR, 2014 WL 5795244, at *6–9 (D.D.C. Nov. 7, 2014) (Finland); *United States v. Gonzalez*, No. CV 13-1867 R(FFM), 2014 WL 1383972, at *7–10 (C.D. Cal. Apr. 9, 2014) (Mexico); *In re Extradition of Johnson*, No. 12-65M, 2012 WL 4973938, at *8–10 (W.D. Pa. Oct. 17, 2012) (Mexico). The Ninth Circuit has gone so far as to describe the lapse-of-time language in *this* treaty as "embody[ing]" a "limitations requirement." *Clarey v. Gregg*, 138 F.3d 764, 767 (9th Cir. 1998).

The majority responds that two of the cases (*Murphy* and *Kamrin*) involved lapse-of-time provisions relating only to the law of the *requesting* party—Australia in the one and Canada in the other. *Supra* at 16. But how that could make a difference eludes me. In each instance, the

laws of the requesting party included speedy-trial-like protections.  *See* Canadian Charter of Rights and Freedoms § 11(b) ("Any person charged with an offence has the right . . . to be tried within a reasonable time."); *Jago v. District Court* (1989) 168 CLR 23 (Austl.) (declining to recognize a "special right to a speedy trial" but acknowledging that undue delay can result in prejudice and thereby violate a defendant's right to a fair trial, and citing *Barker v. Wingo*).  The majority adds that one of the cases (*Kraiselburd*) included a speedy-trial claim.  *Supra* at 16. Yes indeed.  But the defendant grounded his claim on a different clause, one giving fugitives "the right to use such remedies and recourses as are provided by the law of the requested Party." 786 F.2d at 1398.  That, then, was a case involving a defendant intent on bringing a speedy-trial claim but who opted against using the "lapse of time" clause in the same treaty to do so.  That is not just the case of the dog who didn't bark.  *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991). It is the case of the dog who, even when he did bark, chose to bark up a different tree.

*Commentary.* Scholars have joined the chorus.  The Third Restatement of Foreign Relations Law discusses "lapse of time" in terms of "statutes of limitations," "periods of limitations," and "time-bar[s]."  *Restatement (Third) of the Foreign Relations Law of the United States* § 476 cmt. e (1987).  It does not refer to speedy-trial rights as a ground for resisting extradition.  A scholar recently rejected the notion, concluding that "the right to a speedy trial simply ha[s] no application in international extradition proceedings, either on the force of the Sixth Amendment alone, or through a 'lapse of time' provision in a treaty."  Roberto Iraola, *Due Process, the Sixth Amendment, and International Extradition*, 90 Neb. L. Rev. 752, 783 (2012). Nor is this discussion a modern invention.  A nineteenth-century treatise considered extraditions barred by "lapse of time" and by "statutes of limitations" to be one and the same.  John B. Moore, *A Treatise on Extradition and Interstate Rendition* § 373 (1891).

The model treaty promulgated by the United Nations to help countries create new extradition regimes also supports this view.  That document gives States a variety of options to deal with "lapse of time":  for example, by "provid[ing] that acts of interruption in the requesting State should be recognized in the requested State."  G.A. Res. 52/88, Annex, art. 3(2) & n.9, U.N. Doc. A/RES/52/88 (Dec. 12, 1997).  This flexibility, the accompanying best-practices manual explains, stems from the reality that "[d]omestic legal frameworks governing *lapse of*

*time* often vary widely, with various formulae for calculating the *expiration of the statutory period*." *Revised Manuals on the Model Treaty on Extradition and on the Model Treaty on Mutual Assistance in Criminal Matters* ¶ 55, at 19, U.N. Office on Drugs & Crime, http://www.unodc.org/pdf/model_treaty_extradition_revised_manual.pdf (last visited July 9, 2015) (emphasis added).

*Default rule.* Even if there were some ambiguity about whether the phrase "barred by lapse of time" covered statutes of limitations *and* speedy-trial rights (which, with respect, there is not), that would not change things. Any ambiguity in an extradition treaty must be construed in favor of the "rights" the "parties" may claim under it. *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933). The parties to the treaty are countries, and the right the treaty creates is the right of one country to demand the extradition of fugitives in the other country—to "facilitate extradition between the parties to the treaty." *See* M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 134 (5th ed. 2007). As the First Circuit puts the point, *Factor* requires courts to "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories." *In re Extradition of Howard*, 996 F.2d 1320, 1330–31 (1st Cir. 1993). The point of an extradition treaty after all is to facilitate extradition, as any country surely would agree *ex ante*. In the face of one reading of "lapse of time" that excludes the speedy-trial right and another reading that embraces it, *Factor* says we must prefer the former.

This default rule accords with comity considerations that lurk beneath the surface of all extradition cases. Courts must take care to avoid "supervising the integrity of the judicial system of another sovereign nation" because doing so would "directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir. 1976); *see* 18 U.S.C. § 3181(b). Respect for the sovereignty of other countries explains why an American citizen who "commits a crime in a foreign country . . . cannot complain if required to submit to such modes of trial . . . as the laws of that country may prescribe for its own people." *Neely v. Henkel*, 180 U.S. 109, 123 (1901). And it explains why "[w]e are bound by the existence of an extradition treaty to assume that the trial [that occurs after extradition is granted] will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) (Holmes, J.). These constraints

reflect the reality that "political actors," not judicial ones, are best equipped to make the "sensitive foreign policy judgments" an extradition request demands. *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). The habeas power does not come with the authority to interfere with proceedings "inevitably entangled in the conduct of our international relations," *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959), unless the treaty demands it. Just recently, the Supreme Court reminded Congress to tread carefully before entangling itself in American foreign policies customarily overseen by the Executive Branch. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2094–96 (2015). Our court would be wise to heed the same advice here.

Interpreting this treaty in a way that suddenly sweeps speedy-trial rights into its coverage does not honor these objectives and would affirmatively disserve them. Because the constitutional speedy-trial right has no fixed time limit, in contrast to statutes of limitations, what extraditee will not raise the claim in all of its indeterminate glory? The mutability of the right makes it impossible to know how much delay is too much delay. Take the alleged delay in Cruz Martinez's case: around six years. That is not enough to state a speedy-trial claim in view of other considerations, some courts have said, *e.g.*, *United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006), but it very well could be, some other courts have said, *e.g.*, *United States v. Velazquez*, 749 F.3d 161, 186 (3d Cir. 2014). What of the question of fault? Whether the State or a defendant is more to blame for untoward delays is "[t]he flag all litigants seek to capture" in a speedy-trial claim. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Before we task the courts of both countries with refereeing these ineffable—and deeply sensitive—inquiries, we should be sure the negotiating countries wanted them as umpires.

In the final analysis, Cruz Martinez's argument comes up short. No matter where I look—to the text of this treaty, to the text of other treaties, to judicial decisions interpreting those treaties, to commentaries explaining those treaties, to guidance explaining how to draft those treaties, to the *Factor* default rule—all roads lead to the same conclusion. The United States and Mexico did not impose a speedy-trial limit on the category of extraditable criminals when they referred to the "prosecution" and "enforcement" of certain offenses that have "become barred by lapse of time."

B.

In arguing that "lapse of time" means something else, Cruz Martinez and the majority note that this is not the first extradition treaty between the United States and Mexico. A previous version prohibited extradition when prosecution or enforcement "has become barred by limitation." Extradition Treaty, U.S.-Mex., art. III(3), Feb. 22, 1899, 31 Stat. 1818. The present version, they point out, replaced the phrase "barred by limitation" with the phrase "barred by lapse of time" and in the process, they submit, expanded the scope of the provision to cover speedy-trial rights.

But this argument assumes that the new phrase captures more ground than the old phrase with respect to the issue at hand. It does not. The word "time" appears nowhere in the phrase "barred by limitation." But the context of the treaty, all authority interpreting the treaty, and both parties to this case agree that the phrase refers only to *time* limitations—not anything and everything that might "limit" a criminal prosecution, such as *all* of the criminal procedure protections that appear in the Bill of Rights and *all* of the state and federal laws that protect criminal suspects. The fact that the old phrase impliedly included a time limitation eliminates the significance of the new phrase's reference to "time" no matter how the phrase is glossed: "time bar," "time limitation," "lapse of time," "lapse in time," "passage of time," and so on. Cruz Martinez recognizes as much when he concedes that the phrase "barred by limitation" "restrict[s] the [old treaty's] *time-bar provision* to the operation of statutes of limitations." Appellant's Br. 47–49 (emphasis added). If the old treaty contained a time-bar provision, as he admits it did, there is nothing about the new language that *adds* to the provision's breadth—and thus nothing that gives him traction in claiming that it suddenly extends to speedy-trial rights. Is it really possible, as the majority seems to think, that "barred by lapse of time" and "barred by time limitation" both cover statutes of limitations but just one of them also covers speedy-trial rights? That is a heavy lift as a matter of linguistics and common sense.

Even if, in the face of all evidence to the contrary, the new phrase somehow some way covered more ground than the old phrase, Cruz Martinez has not shown that "barred by lapse of time" encompasses the right to a speedy trial. Even the most ruthlessly textual analysis of the phrase must return to this reality: *Time* does the barring, and the constitutional speedy-trial right

*does not* have a fixed time limit, in contrast to statutes of limitations, and it *does* contain several other requirements beyond just delay, in contrast to statutes of limitations. That is why it makes no difference that "lapse of time" or variations on the phrase have appeared in the context of several other doctrines with a temporal component: laches, estoppel, the Speedy Trial Act, and the speedy-trial right itself. Each of these other doctrines regards the (relative) passage of time as a necessary condition, not a sufficient one, meaning time and other considerations together do the "barring." Not so with *this* clause.

And that is why it makes no difference that the phrase "lapse of time" might well have a broader meaning in isolation. It might mean all kinds of things in other settings. Witness Hamlet's plaintive request to his father's ghost: "Do you not come your tardy son to chide, that, lapsed in time and passion, lets go by the important acting of your dread command?" William Shakespeare, *Hamlet* act 3, sc. 4. The question, however, is what words mean "in their context," not in the abstract or in *other* settings. To think otherwise about the matter calls to mind the spelunker who leaves home with an excellent map and a broken headlamp. One is of no use without the other. So too of text without context. Not a single extant source of authority in *this* context—the language of an international extradition treaty—equates "barred by lapse of time" with "barred by the Sixth Amendment."

One court at one point, I must acknowledge, agreed with Cruz Martinez's reading. The court in *In re Extradition of Mylonas*, 187 F. Supp. 716, 721 (N.D. Ala. 1960), ruled that the phrase "lapse of time or other lawful cause" applied to speedy-trial violations, but it did so without *any* explanation. When it came time to assess whether an explanation for the *Mylonas* court's conclusion could be found, the Eleventh Circuit came up dry, and "expressly disapprove[d]" the district court's half-sentence ruling. *Martin v. Warden*, 993 F.2d 824, 829 n.8 (11th Cir. 1993). That just one court in history has agreed with Cruz Martinez's position—for a momentary lapse of time, shall we say—tells us all we need to know about the frailty of this position.

Nor does the dissent in *Yapp*, 26 F.3d at 1568–73 (Carnes, J., dissenting), another Eleventh Circuit case, add any fuel to this argument. Judge Carnes *endorsed* the American government's position in this case when he explained that a hypothetical treaty provision

referring only to "lapse of time" would refer "only to statutes of limitation[s]." *Id.* at 1570. It is not often that all relevant majority opinions *and* dissents support the same position. Yet that is just the case here—or at least it was until today's decision.

The majority also leans on the phrase "enforcement of the penalty" in Article 7, claiming that it eliminates "any doubt that the scope of [Article 7] extends beyond the initiation of prosecution" and incorporates speedy-trial protections. *Supra* at 10 n.1. "[A]ny doubt"? The majority elsewhere acknowledges that "fair-minded jurists could dispute th[e] conclusion." *Id.* at 13. Be that as it may, the point is wrong. In many civil-law countries, statutes of limitations bar not only the initiation of prosecutions but also excessive delays between conviction and sentencing. *See* S. Exec. Rep. No. 104-32, at 13. As it turns out, the law of Oaxaca—the state where Cruz Martinez's alleged crime occurred—provides as much. "The statute of limitations," it says, "shall be interrupted, and consequently, the established periods shall be reset and shall begin anew, at the time of the reading of the charges at arraignment *or at the time of the reading of the verdict*, even if subject to appeal." R. 2-19 at 2 (emphasis added). The statute of limitations in other words operates to prevent undue postponement between conviction and the "enforcement of the penalty," refuting the majority's assertion that the "enforcement" language broadens Article 7's scope.

Cruz Martinez insists that we should not be troubled by the absence of supporting authority or the circuit split his argument creates. He observes that the Eleventh Circuit had not yet overturned *Mylonas*'s half-sentence ruling when the United States and Mexico concluded the revised treaty at issue. But it does not follow that the United States meant to incorporate and Mexico meant to import that unexplained, lapse-in-reasoning, less-than-landmark ruling into the treaty. Start with the reality that this treaty does not use the same language as the treaty discussed in *Mylonas*. That one said "lapse of time *or other lawful cause*," 187 F. Supp. at 721 (emphasis added); this one says "lapse of time" alone. It would be odd to conclude that the treaty's drafters meant to adopt this trial court's decision but then used different—and narrower—language. The treaty's drafting history confirms as much. Its transmittal materials do not mention the Sixth Amendment once, an omission that takes on special significance in light of the Senate Committee on Foreign Relations' decision to include a list of differences

between the treaty and "previously ratified" treaties.  *See* S. Exec. Rep. No. 96-21, at 19 (1979).  The speedy-trial right appears nowhere on that list.

Other agreements drafted during the same period as the U.S.-Mexico Treaty confirm that *Mylonas* was not on anyone's radar.  At least seven extradition treaties drafted between 1960 (when *Mylonas* was handed down) and 1993 (when it was overruled) include provisions similar to Article 7 of the U.S.-Mexico Treaty.  The Senate Executive Reports accompanying each of these documents indicated that "lapse of time" referred to statutes of limitations.  S. Exec. Rep. No. 98-33, at 4–5 (1984) (Italy); S. Exec. Rep. No. 98-30, at 6 (1984) (Costa Rica); S. Exec. Rep. No. 98-29, at 5 (1984) (Thailand); S. Exec. Rep. No. 96-18, at 26 (1979) (Turkey); S. Exec. Rep. No. 93-19, at 3 (1973) (Paraguay, Uruguay); S. Exec. Rep. No. 91-20, at 3–4 (1970) (New Zealand); *see United States v. Stuart*, 489 U.S. 353, 366–68 (1989) ("[A] treaty's ratification history and its subsequent operation" can "assist . . . in 'giving effect to the intent of the Treaty parties.'" (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982))).  I have not found, and neither Cruz Martinez nor the majority has produced, a shred of evidence suggesting that anyone meant to deviate so drastically from a consensus so settled.

The context of this interpretive dispute—language in an extradition treaty—dispenses with another of Cruz Martinez's rejoinders:  that, in other circumstances, the lapse-of-time shorthand can refer not just to statutes of limitations but also to other doctrines rooted in the passage of time.  Take a comment in the Third Restatement equating "lapse of time" with a "delay in presentation" due to "negligence or laches." *Restatement*, *supra*, § 902 cmt. c.  Section 902, however, concerns not extradition but country-versus-country disputes involving violations of obligations owed by one to the other.  It regulates not the defenses of a person facing extradition but the defenses of a *country* accused by another for failing to live up to its word. *Id.* The section thus does not prove that the phrase "lapse of time" incorporates an *individual* speedy-trial right in this setting, especially when the one pertinent comment from the Restatement indicates that, for extradition purposes, the term "lapse of time" extends to limitations periods only. *Id.* § 476 cmt. e.

Cruz Martinez's reliance on *Doggett v. United States*, 505 U.S. 647 (1992), is a figleaf. *Doggett* holds that, for Sixth Amendment purposes, a government's failure to seek a defendant's

extradition may show that it (as opposed to the defendant) is "more to blame" for a trial's delayed start. *Id.* at 651–53. I of course agree that the Sixth Amendment contains a speedy-trial clause, that a citizen may invoke the clause in prosecutions in *this* country, and that the cause for any delay is relevant to *this* inquiry. But *Doggett* does not remotely stand for the proposition that, for purposes of treaty interpretation, the Sixth Amendment qualifies as a law barring prosecution or enforcement "by lapse of time."

By shearing the phrase "lapse of time" from its context, moreover, Cruz Martinez introduces a serious complication. If "lapse of time" covers the constitutional speedy-trial guarantee, there is no reason to think it would not cover the statutory one. The Speedy Trial Act says that "the trial of a defendant charged . . . with the commission of an offense shall commence within seventy days" of the indictment. 18 U.S.C. § 3161(c)(1). Now *that* is a *time bar.* Even though *this* speedy-trial right—the one Cruz Martinez has not invoked—contains a threshold time bar, that seventy days may be extended by "a number of excusable delays that do not subtract time from the clock." *Id.* Examples include time spent on competency examinations, interlocutory appeals, removal proceedings, consideration of plea agreements, continuance requests, and international discovery. *See* 18 U.S.C. § 3161(h). Many of these procedures have a uniquely American cast, making the statute difficult if not impossible to apply to the actions of a country without them. The statute thus makes time *extensions* no less important than time *limits*. Yet Cruz Martinez's undifferentiated definition would force us to apply this statute too in future cases, as he acknowledges.

That will leave foreign nations with just seventy days to issue any extradition request after the Act's clock starts ticking in order to avoid debates about whether proper extensions have been given. What happens next will be the kudzu-like spreading of Speedy Trial Act claims and the choking out of statute-of-limitations claims—and thus the choking out of the *one claim* that all had agreed was covered by the phrase "barred by lapse of time." In case after case, extradition requests that violate no statute of limitations will be denied for Speedy Trial Act violations.

Take Cruz Martinez's situation. The majority correctly finds that the U.S. and Mexican statutes of limitations have not run. Yet because more than seventy days have passed since

Mexico issued an arrest warrant for Cruz Martinez, the Speedy Trial Act would (if applied) prevent his extradition. The same is true of other cases. Consider *United States v. Garfias*, a case from the Northern District of California that involved another extradition request from Mexico. 2009 WL 2580641, at *1. A magistrate judge held that the U.S. statute of limitations did not prevent Garfias's extradition, *id.* at *3–5—but the Speedy Trial Act would seem to act as a bar due to the nearly eight-year delay between Mexico's arrest warrant and its extradition request, *id.* at *1. The list goes on. *See, e.g.*, *Sainez v. Venables*, 588 F.3d 713, 715–17 (9th Cir. 2009) (finding that U.S. and Mexican statutes of limitations did not bar an individual's extradition in a case where there was a seven-year gap between the issuance of a Mexican arrest warrant and the extradition request); *In re Flores Ortiz*, 2011 WL 3441618, at *1, *6–7 (holding that Flores Ortiz's extradition did not violate the U.S. statute of limitations in a case where there was nearly a three-year delay between the issuance of a Mexican arrest warrant and the extradition request); *In re Salazar*, 2010 WL 2925444, at *4–5 (finding that Salazar's extradition did not violate Mexican or U.S. statutes of limitations in a case where there was nearly a ten-year delay between the issuance of a Mexican arrest warrant and the extradition request). Indeed, after today's decision, I know of no lapse-of-time case in which the most fruitful line of attack will not be the statutory, or for that matter the constitutional, speedy-trial claim.

I am not sure what to make of the majority's first response—that the "barred by lapse of time" provision in Article 7 would not apply to statutory claims because the statute gives district courts discretion to dismiss with or without prejudice and thus the seventy-day limit would not necessarily "bar" the prosecution. 18 U.S.C. § 3162(a)(2); *supra* at 19. If that theory sounds familiar, it is because it duplicates my theory of the case and my suggestion about how to handle statutory *and* constitutional speedy-trial claims. Of course, neither speedy-trial right is a "lapse of time" provision that "bars" prosecutions. But if one had to pick one or the other as a candidate, one would assuredly pick the one that has a definitive time limit—seventy days—and thus parallels statutes of limitations in at least *one* respect. That the district court has discretion to dismiss some statutory speedy-trial violations without prejudice adds no fuel to the argument at any rate. That means only that the extraditee will not always prevail; but that was always a possibility given the many exceptions to the statutory speedy-trial rights. And it is no answer to the constitutional claim, where dismissals with prejudice are the rule. *United States v. Young*,

657 F.3d 408, 413 (6th Cir. 2011); *see also Strunk v. United States*, 412 U.S. 434, 439–40 (1973).

I also am not sure what to make of the majority's second response—that, even if Article 7 covers statutory speedy-trial claims, there is nothing to worry about because the statute has many exceptions, including "[a]ny period of delay resulting from the absence or unavailability of the defendant." *Supra* at 19 (quoting 18 U.S.C. § 3161(h)(3)(A)). But of course the constitutional claim has many exceptions, including this one. *Doggett*, 505 U.S. at 651 (To assess a constitutional speedy-trial claim, courts must determine "whether the government or the criminal defendant is more to blame for th[e] delay."); *Wilson v. Mitchell*, 250 F.3d 388, 395 (6th Cir. 2001) (rejecting a constitutional speedy-trial claim where the defendant "actively evaded discovery"). I thus see no coherent way to distinguish the two claims—and least of all a way to make the seventy-day claim the one that does not apply. That leaves me where I started. Under the majority's decision, the central argument, if not the only argument, in future "barred by lapse of time" claims will turn on speedy-trial rights (statutory or constitutional), not statute-of-limitations rights, even though the latter have been the only claim covered by the phrase—until now.

The majority adds that, because the phrase "barred by lapse of time" *could* be read broadly, it *must* be read broadly. Not even Cruz Martinez embraces this theory, as he never argues that *Factor* requires ambiguous treaty provisions to be read *in his favor*. In fact, neither of his briefs cites *Factor* at all, much less distinguishes it. There is a reason for the omission. *Factor*, remember, speaks in terms of maximizing the "rights" the "parties" to a treaty may claim under it. The parties to this treaty are countries, not their citizens, and the right the parties may claim is the right of a country to demand extradition, not the right of a citizen to demand a speedy trial. The majority's contrary approach, which substitutes "extraditees" for "signatories" and constitutional rights for treaty rights, misapprehends how the *Factor* presumption works.

My conclusion—that the right conferred by an extradition treaty is the right to request extradition—does not change because the provision at issue places limits on extradition. The same was true for the provision in *Factor*, which permitted extradition "only . . . upon such evidence of criminality as, according to the laws of the place where the fugitive . . . shall be

found, would justify his apprehension and commitment for trial if the crime . . . had there been committed." 290 U.S. at 287 n.1. Great Britain asked the United States to extradite John Factor for conduct that was criminal on that side of the pond but legal on this side of the pond. To overcome the fact that the applicable treaty did not implement the principle of specialty, Factor asked the Court to read that restriction into the words "according to the laws of the place where the fugitive . . . shall be found." If the majority were right, the Court would have construed that provision not to promote extradition but to protect the extraditee. It did the opposite. The only "right" the Court mentioned, indeed the only "right" the Court analyzed, was "the legal right to demand [Factor's] extradition." *Id.* at 287.

The majority also disregards cases from circuits that have remained faithful to what *Factor* says. Consider the First Circuit's opinion in *Howard*. That case concerned a treaty provision barring extradition when the request was "made with a view to try or punish [the extraditee] on account of his race, religion, nationality or political opinions." 996 F.2d at 1330. The United Kingdom asked the United States to extradite Curtis Howard to stand trial for murder. Howard resisted by arguing that these terms included *all* "nationality-based and race-based biases"—as opposed to "only those [biases] directly affecting" him. *Id.* at 1329. If the majority were right, the First Circuit should have construed that provision not to promote extradition but to protect the extraditee. Relying on *Factor*, the First Circuit refused. Any other result, it explained, would convert the extradition treaty into "an impediment to extradition"—into "a non-extradition treaty" in other words. *Id.* at 1330.

Nor do the four cases cited by the majority help Cruz Martinez. *See supra* at 13 n.3 (citing *Nielsen v. Johnson*, 279 U.S. 47, 52, 57–58 (1929); *Jordan v. Tashiro*, 278 U.S. 123, 127 (1928); *Asakura v. City of Seattle*, 265 U.S. 332, 339–40 (1924); *Geofroy v. Riggs*, 133 U.S. 258, 271–72 (1890)). Each of these cases involved "friendship, commerce, and navigation treaties" between the United States and another country—treaties that were "primarily concerned with the trade and shipping rights of individuals." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185–86 (1982). The Court, no surprise, interpreted ambiguous individual-rights-creating provisions in those treaties with an eye toward maximizing citizens' rights. The same cannot be said for an extradition treaty designed to create a right that would not exist in the treaty's

absence:  the right of a State to demand the "surrender of a fugitive" living in another State. *Factor*, 290 U.S. at 298; *see Howard*, 996 F.2d at 1329.

That leaves what may be Cruz Martinez's ultimate worry:  that rejecting his interpretation of the treaty would allow Mexico to seek the extradition of an American citizen years after a valid Mexican arrest warrant has issued.  Just such a prospect exists here, he claims, given his claim that he never tried to hide his address from American or Mexican authorities.  But it is not this Court's "province" to expand the treaty's scope in search of a seemingly "desirable result." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015).  Otherwise, the treaty would mean one thing for some fact patterns and something else for other fact patterns.  Treaty interpretation, as opposed to executive-branch discretion, does not turn on shifting fact patterns. Cruz Martinez's arguments on this score are best directed at the Secretary of State, who retains "sole discretion to determine whether [someone] should actually be extradited." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997); *see* Extradition Treaty, U.S.-Mex., art. 9(1), *supra*, 31 U.S.T. at 5065.  That discretion would permit *any* untoward extradition from going forward, including potentially this one.

Making matters worse, the majority creates the possibility of renewed discovery to determine whether a speedy-trial violation has occurred.  *Supra* at 24–26.  If so, the district court will have to wade into the complex world of diplomatic give-and-take, determining whether U.S. and Mexican communications reveal a justifiable reason for the delay in Cruz Martinez's extradition.  Prying into consular correspondence is precisely the sort of thing we should avoid unless the treaty expressly requires it.  The State Department is better situated to access and assess the sorts of transnational communiques that Cruz Martinez will seek on remand—which is why his requests for relief are better directed to our diplomats than to our judges.

\*       \*       \*

By endorsing Cruz Martinez's novel reading of the phrase "barred by lapse of time," the majority has set off on a bold adventure.  Its holding contradicts the text and context of the treaty.  Its reasoning undermines the background principles that have guided extradition in this country for 200 years and counting.  And its result, unsupported by any relevant precedent, departs from the law of other circuits on not one but two issues.

But that may be the least of its problems. Today's holding will control all future extradition hearings the magistrate judges in our circuit might conduct. And should a magistrate refuse to certify someone for extradition on account of that holding, the United States may not be able to appeal that refusal—though Mexico could refile the extradition request (which would only make any speedy-trial violation *worse*). *See In re Mackin*, 668 F.2d 122, 126–30 (2d Cir. 1981) (Friendly, J.). As a consequence, savvy fugitives in the United States facing charges in Mexico (or any other country with a "barred by lapse of time" treaty provision) will receive speedy-trial protections if they flee to the four States of our circuit but not if they flee to other States in our country. And Mexico will be forced to structure its extradition requests around the whims of our judicial geography, to say nothing of our malleable Sixth Amendment jurisprudence.

I respectfully dissent.